**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

NATE RAHN, individually and on behalf of all others similarly situated,

Plaintiff,

v.

TIKTOK, INC., a California corporation, and BYTEDANCE INC., a Delaware corporation,

Defendant.

Case No. ________________

**JURY TRIAL DEMANDED**

**COMPLAINT - CLASS ACTION**

Plaintiff Nate Rahn ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class action complaint against TikTok, Inc. f/k/a Musical.ly, Inc. ("TikTok") and ByteDance, Inc. ("ByteDance") (collectively, "Defendants"), and in support thereof alleges the following:

**INTRODUCTION**

1. This is a class action brought against Defendants for surreptitiously intercepting the private electronic communications of users of TikTok's social media application (the "TikTok app") and its integrated website browser (the "in-app browser") without their consent. Defendants intercept these private electronic communications in violation of the Federal Wire Tap Act, 18 U.S.C. § 2510, *et seq*. by embedding JavaScript code into the third-party websites that are accessed using TikTok's in-app browser, which enables Defendants to track users' mouse movements, clicks, keystrokes (*e.g.*, text being entered into an information field or text box), URLs of web pages visited, and other electronic communications in real time (collectively, "Website Communications").

2. Plaintiff brings this action individually and on behalf of a class of all natural persons in the United States whose Website Communications were intercepted by Defendants while using the TikTok in-app browser to visit third-party websites, and seeks all civil remedies provided under the Federal Wire Tap Act, including but not limited to appropriate equitable and/or declaratory relief, damages in an amount to be determined at trial (assessed as the greater of (a) the sum of actual damages suffered by Plaintiff and the proposed Class and any profits made by Defendants as a result of the violation, or (b) statutory damages of $100 per day per violation or $10,000, whichever is greater), and reasonable attorneys' fees and costs.

## PARTIES

3. **Plaintiff** Nate Rahn is a citizen of the state of Illinois, and at all times relevant to this action, resided and was domiciled in Cook County, Illinois. Plaintiff is a citizen of Illinois.

4. **Defendant ByteDance, Inc**. is, and at all relevant times was, a Delaware corporation with its principal place of business in Mountain View, California. Defendant ByteDance, Inc. is a wholly owned subsidiary of ByteDance, Ltd., a Cayman Islands corporation.

5. **Defendant TikTok, Inc. f/k/a Musical.ly, Inc.** ("TikTok, Inc.") is, and at all relevant times was, a California corporation with its principal place of business in Culver City, California.[1] Defendant TikTok, Inc. also maintains offices in Palo Alto, California and Mountain View, California.[2] The name change from Musical.ly, Inc. to TikTok, Inc. occurred in May 2019. Defendant TikTok, Inc. is a wholly owned subsidiary of TikTok, LLC, which in turn is a wholly

[1] https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

[2] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/; https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

owned subsidiary of TikTok, Ltd. And TikTok, Ltd. – like Defendant ByteDance, Inc. – is a wholly owned subsidiary of ByteDance, Ltd.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this suit is brought under the laws of the United States, namely the Federal Wire Tap Act, 18 U.S.C. §§ 2510 *et seq*.

7. This Court has personal jurisdiction over Defendants because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in Illinois. The privacy violations complained of herein resulted from Defendants' purposeful and tortious acts directed towards citizens of Illinois while they were located within Illinois. At all relevant times, Defendants knew that their practices would directly result in collection of information from Illinois citizens while those citizens used the TikTok in-app browser. Defendants chose to avail themselves of the business opportunities of making their services specifically available in Illinois and collecting real-time data from TikTok users located in Illinois, and the claims alleged herein arise from those activities.

8. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### A. TikTok Becomes A Global Phenomenon With A Strong Presence In The United States.

9. Musical.ly, now known as TikTok, is a highly popular social media and social networking app that was first launched in 2014. The Musical.ly app allows users to create short

videos of themselves and share them with friends.[3]

10. The Musical.ly app provides tools that users can utilize to create and edit their videos. It also provides a large library of music from which users may select background music for their videos.

11. Beyond creating and sharing of videos, the Musical.ly app provides a platform through which users can interact by, among other things, commenting on other users' videos and "following" their accounts. Users also can send direct messages to communicate with one another on the app.

12. By November 2017, the Musical.ly app had 60 million monthly active users.[4]

13. At approximately the same time, another entity, Beijing ByteDance, launched its own app in China called "Douyin," which roughly mirrored the Musical.ly app.[5] By 2017, shortly before its purchase of Musical.ly, Beijing ByteDance introduced an English-language version of the Douyin app under the name "TikTok" for use outside of the China market.

14. After acquiring Musical.ly, Beijing ByteDance combined the Musical.ly app with its TikTok app in 2018, merging all existing accounts and data into a single app under the retained "TikTok" name.[6] Therefore, Musical.ly and TikTok apps are collectively referred to herein as the "TikTok app," and Musical.ly and TikTok users are collectively referred to as "TikTok users."

15. The TikTok app has become "one of the world's fastest-growing social media

---

[3] https://www.wsj.com/articles/lip-syncing-app-musical-ly-is-acquired-for-as-much-as-1-billion-1510278123.
[4] https://www.wsj.com/articles/lip-syncing-app-musical-ly-is-acquired-for-as-much-as-1-billion-1510278123; https://www.nytimes.com/2019/11/01/technology/tiktok-national-security-review.html.
[5] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.
[6] http://culture.affinitymagazine.us/tik-tok-is-scamming-people-stealing-information/.

platforms" and a "global phenomenon."[7]

16.     According to the *Washington Post*, by November 2019 the TikTok app had been downloaded more than 1.3 billion times worldwide, and more than 120 million times in the United States.[8] By April 2020, *TechCrunch* reported that the number of worldwide TikTok app downloads had surpassed 2 billion, and that in "the quarter that ended on March 31, TikTok was downloaded 315 million times — the highest number of downloads for any app in a quarter."[9] By many accounts, the TikTok app is the most downloaded non-game app in the world.[10]

17.     As of the third quarter of 2022, TikTok had 1.5 billion monthly active users.[11] The average user opened the TikTok app more than 8 times per day and spent approximately 45 minutes on the app daily as of March 2019.[12]

18.     TikTok's massive global presence has also reached the United States. As of August 2020, TikTok admitted to having more than 100 million monthly active users in the United States.[13] Some estimates indicate there are 123.8 million active users of TikTok in the United States.[14] In other words, over one-third of the United States' 328.2 million population has used TikTok, and approximately 50 million Americans use TikTok every day.[15]

---

[7] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[8] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[9] https://techcrunch.com/2020/04/29/tiktok-tops-2-billion-downloads/.

[10] https://www.cnbc.com/2019/07/25/china-camera-apps-may-open-up-user-data-to-beijing-government-requests.html.

[11] https://www.demandsage.com/tiktok-user-statistics/.

[12] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

[13]   Complaint for Injunctive and Declaratory Relief, ¶ 19, *TikTok Inc. v. Donald J. Trump et al.*, No. 2:20-cv-7672, (C.D. Cal. Aug. 24, 2020), ECF No. 1, available at: https://cdn.vox-cdn.com/uploads/chorus_asset/file/21812645/document__1_.pdf (hereafter "*TikTok v. Trump*").

[14] *See* https://commercialfreechildhood.org/wp-content/uploads/2020/05/tik_tok_complaint.pdf.

[15] *TikTok v. Trump*, ¶ 21.

**B. TikTok Profits From Monetizing Users' Personal Data**

19. The "world's most valuable resource is no longer oil, but data."[16] In today's world, the ability to obtain and utilize customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that businesses who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[17]

20. Unsurprisingly, consumers' personal data has inherent, measurable value. The Organization for Economic Cooperation and Development ("OECD") previously estimated the prices for various elements of personal data, including $0.50 USD for an address, $2.00 USD for a date of birth, $8.00 USD for a social security number, $3.00 USD for a driver's license number, and $35.00 USD for a military record. [18]

21. TikTok's financial success is due in large part to its ability to obtain and utilize consumers' personal financial information to create targeted advertising that it runs through the TikTok app. Thus, this targeted advertising relies upon TikTok's knowledge of each of its user's personal preferences.[19]

22. Using highly invasive and secretive practices, Defendants have unlawfully collected private personal information about TikTok's users that Defendants then monetize

---

[16] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longeroil-but-data.

[17] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[18] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[19] https://www.digitaltrends.com/social-media/tiktok-advertiser-audience-network-targeted-ads/.

through advertising.

23. As a result of these practices, TikTok was able to generate an estimated $4.6 billion in revenue in 2021, a 142% increase year-over-year.[20]

**C. Prior Privacy Concerns Regarding Musical.ly/TikTok's Data Use Practices**

**1. The 2019 FTC Action**

24. On February 27, 2019, the United States, on behalf of the Federal Trade Commission ("FTC"), filed a lawsuit against Musical.ly alleging it had violated the Children's Online Privacy Protection Act ("COPPA") by collecting and using personal data from children under age 13 without the required notice and consent from parents or guardians.[21] According to the FTC, Musical.ly's violations were knowing and willful, as it received numerous complaints from concerned parents. In fact, in a two-week period in September 2016, Musical.ly received more than 300 complaints from angry parents demanding that Musical.ly close their children's accounts.[22] While Musical.ly closed the accounts, they did not delete the minors' videos or profile information from their servers.[23]

25. Ultimately, Musical.ly stipulated to an order requiring, among other things, payment of a $5.7 million civil penalty and injunctive relief regarding the collection and destruction of children's personal data.[24] This fine is the largest civil penalty ever imposed for such

[20] https://www.businessofapps.com/data/tik-tok-statistics/.
[21] *United States of America v. Musical.ly and Musical.ly, Inc.*, United States District Court, Central District of California, Case No. 2:19-cv-1439 [ECF No. 1]
[22] *Id*. at ¶ 21.
[23] *Id*.
[24] *United States of America v. Musical.ly and Musical.ly, Inc.*, United States District Court, Central District of California, Case No. 2:19-cv-1439 [ECF No. 10].

a violation.[25] According to the FTC, "[i]n our view, these practices reflected the company's willingness to pursue growth even at the expense of endangering children."[26]

26. Musical.ly's compliance with the FTC stipulation has been called into question. In 2020, the FTC renewed its interest in Musical.ly and TikTok, going as far as to issue an order requiring TikTok to provide information regarding how it collects and uses its users' personal information, as well as information regarding TikTok's advertising practices. [27]

27. In 2020, the FTC further issued a joint statement explaining that social media companies like TikTok "have been able to exploit their user-surveillance capabilities to achieve such significant financial gains that they are now among the most profitable companies in the world." Moreover, social media companies' "constant access" to users' mobile devices allows them "to monitor where users go, the people with whom they interact, and what they are doing."[28]

**2. The United States Senate**

28. In October 2019, United States Senators Charles Schumer and Tom Cotton sent a letter to the Acting Director of National Intelligence describing the "national security" risks posed by the TikTok app. In that letter, the Senators noted there was evidence that Defendants may share private and personally identifiable user data and content with the Chinese government:

> TikTok's terms of service and privacy policies describe how it collects data from its users and their devices, including user content

[25] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861; https://www.techinasia.com/tiktok-owner-bytedance-gathers-1-billion-monthly-active-users-apps.

[26] https://www.nbcnews.com/tech/tech-news/tiktok-pay-5-7-million-over-alleged-violation-child-privacy-n977186.

[27] https://www.ftc.gov/news-events/press-releases/2020/12/ftc-issues-orders-nine-social-media-video-streaming-services.

[28] https://www.ftc.gov/system/files/documents/reports/6b-orders-file-special-reports-social-media-video-streaming-service-providers/joint_statement_of_ftc_commissioners_chopra_slaughter_and_wilson_regarding_social_media_and_video.pdf

> and communications, IP address, location-related data, device identifiers, cookies, metadata, and other sensitive personal information. While the company has stated that TikTok does not operate in China and stores U.S. user data in the U.S., ByteDance is still required to adhere to the laws of China.
>
> Security experts have voiced concerns that China's vague patchwork of intelligence, national security, and cybersecurity laws compel Chinese companies to support and cooperate with intelligence work controlled by the Chinese Communist Party. … With over 110 million downloads in the U.S. alone, TikTok is a potential counterintelligence threat we cannot ignore. Given these concerns, we ask that the Intelligence Community conduct an assessment of the national security risks posed by TikTok … and brief Congress on these findings.[29]

29. Similarly, at a hearing held by the Senate Judiciary Subcommittee on Crime and Terrorism, United States Senator Josh Hawley stated in opening remarks: "TikTok should answer … to the millions of Americans who use their product with no idea of its risks."[30] Chairman Hawley also told reporters that: "The idea that TikTok is not sharing data, is not taking direction from Beijing, that just does not appear to be true."[31]

30. Later, in May 2020, a bipartisan group of prominent United States Senators wrote to the FTC that, "[f]aced with compelling evidence that this wildly popular social media platform is blatantly flouting binding U.S. privacy rules, the FTC should move swiftly to launch an investigation and forcefully hold violators accountable."[32]

**3. The 2020 Illinois Biometric Information Privacy Act Litigation**

31. In December 2020, TikTok and related companies were sued for their alleged violation of the Illinois Biometric Information Privacy Act (BIPA), a state statute prohibiting

---

[29] https://www.law360.com/articles/1213180/sens-want-tiktok-investigated-for-national-security-threats; https://www.cotton.senate.gov/?p=press_release&id=1239.

[30] https://thehill.com/policy/technology/469114-tiktok-faces-lawmaker-anger-over-china-ties.

[31] https://thehill.com/policy/technology/469114-tiktok-faces-lawmaker-anger-over-china-ties.

[32] https://www.reuters.com/article/us-tiktok-privacy-usa-children/u-s-senators-urge-probe-of-tiktok-on-childrens-privacy-idUSKBN2352YD.

private companies from collecting, capturing, purchasing, or otherwise obtaining a person's biometric identifiers or information without proper authorization. That case settled for $92 million.

**D. TikTok Collects Users' Website Communications Without Their Consent**

32. People generally access websites using their preferred or default internet browsers, such as Google's Chrome or Apple's Safari. But while using the TikTok app, websites are opened by TikTok's in-app browser instead. Thus, when a TikTok user clicks on a link while using the TikTok app, the website opens in the TikTok in-app browser rather than the user's preferred or default internet browser for that particular device.

33. TikTok's in-app browser was specifically designed to insert JavaScript code into any third-party website that users access while using the in-app browser. The inserted JavaScript code, in turn, intercepts, records, and copies all Website Communications made by the user while interacting with the third-party website accessed using TikTok's in-app browser.[33] This includes, among other things, every click, keystroke, or mouse movement made by the user while interacting with the third-party website.

34. For example, in the case of a user who visits a third-party website to make a purchase, the JavaScript code could intercept, record, and copy the user's name, address, telephone number, date of birth, and credit card information, as well as the user's username and password for the third-party website. In the case of a user's visit to a healthcare provider, the JavaScript code could intercept private and sensitive health-related information about the user's physical

[33] *See* Felix Krause, *iOS Privacy: Instagram and Facebook Can Track Anything You Do on Any Website in Their In-App Browser*, KRAUSEFX.COM (August 10, 2022), https://krausefx.com/blog/ios-privacy-instagram-and-facebook-can-track- anything-you-do-on-any-website-in-their-in-app-browser.

and/or mental health.

35.     Neither the TikTok user nor the third-party website which the user visited consents to the insertion of this JavaScript code.

**E.    Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**

36.     Consumers are skeptical and are wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[34]

37.     Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[35] As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[36]

38.     Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

39.     A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be

---

[34] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.
[35] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.
[36] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

required to provide consumers with a complete list of the data that has been collected about them.[37]

40. Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[38]

41. Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[39]

**CLASS ACTION ALLEGATIONS**

42. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> *All natural persons in the United States who used TikTok's in-app browser to visit websites external to the app.*

43. Excluded from the class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

44. **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members and their identities may

[37] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumerreports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[38] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confusedand-feeling-lack-of-control-over-their-personal-information/.

[39] Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

be obtained from the books and records of Defendants.

45.     **Commonality:** This action involves questions of law and fact that are common to the Class members. Such common questions include, but are not limited to: (a) whether Defendants used JavaScript code to intercept and record Plaintiff's and the proposed Class's Website Communications with third-party websites while using TikTok's in-app browser; (b) whether Defendants violated the Federal Wire Tap Act; (c) whether the Website Communications at issue constitute "electronic communications" for purposes of the Federal Wire Tap Act; (d) whether Defendants derive a benefit or information from interception of Plaintiff's and the proposed Class's Website Communications; (e) whether TikTok's use of JavaScript code as described herein constitutes a "device" used to intercept or record private electronic communications; (f) whether Defendants acquired the contents of Plaintiff's and the proposed Class's private Website Communications without their consent; (g) whether Plaintiff and the proposed Class had a reasonable expectation of privacy in their Website Communications with third-party websites while using TikTok's in-app browser; and (h) whether Plaintiff and the proposed Class are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

46.     **Typicality:** Plaintiff's claims are typical of the other proposed Class members' claims because, among other things, all proposed Class members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the proposed Class had their Website Communications intercepted in violation of privacy federal law. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the proposed Class typical of one another.

47.     **Adequacy of Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the proposed Class. Plaintiff has retained counsel

competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the proposed Class, and Defendant has no defenses unique to any Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the proposed Class, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the interests of the other members of the proposed Class.

48. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

49. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages is common to Plaintiff and each member of the proposed Class. If Defendants intercepted Plaintiff's and the proposed Class's private Website Communications, then Plaintiff and each proposed Class member suffered damages by that conduct.

50. **Ascertainability:** Members of the proposed Class are ascertainable. Class membership is defined using objective criteria and Class members may be readily identified

through Defendants' books and records.

**CLAIM FOR RELIEF**
**Violation of the Federal Wire Tap Act**
**18 .S.C. §§ 2510, *et seq.***

51. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

52. Plaintiff brings this claim individually and on behalf of the Class.

53. The Federal Wire Tap Act provides a private right of action against those who intentionally intercept, attempt to intercept, or otherwise procuring any person to intercept any wire, oral, or electronic communications.

54. As described above, Defendants intercepted Plaintiff's and the proposed Class's Website Communications whenever they utilized TikTok's in-app browser to communicate with third-party websites using the JavaScript code inserted by TikTok, including every mouse movement, click, keystroke (*e.g.*, text being entered into an information field or text box), URL visited, and other electronic communication. These Website Communications – which comprise the transfer of signs, signals, writing, images, sounds data, and/or intelligence transmitted in whole or in party by wire, radio, electromagnetic, photoelectric or photo-optical system – constitute "electronic communications" under the Federal Wire Tap Act and were copied by Defendants contemporaneously, in real time.

55. Defendants sought to intercept Plaintiff's and the proposed Class's Website Communications with third-party websites in order to obtain the personal information and data about Plaintiff and the proposed Class contained in the contents of the Website Communications.

56. Defendants purposely and consciously wanted to intercept these Website Communications as part of their business model designed to monetize the personal information and data obtained from these Website Communications. Defendants derive revenue from their ability to monetize such personal information to target advertising, which was accomplished using

JavaSctipt code intentionally designed and engineered for that very purpose. Interception of these Website Communications was in Defendants' self-interest.

57. Defendants intercepted these Website Communications using a device or apparatus—*i.e.*, the JavaScript code inserted by TikTok whenever a user of the TikTok app interacted with a third-party website using TikTok's in-app browser—which was used to acquire the contents of users' Website Communications. These interceptions were made contemporaneously by Defendants as the Website Communications were made.

58. When communicating electronically with these third-party websites, Plaintiff and the proposed Class reasonably believes and expected these Website Communications to be private.

59. Defendants intercepted Plaintiff's and the proposed Class's Website Communications at the time of transmission without the consent of Plaintiff, the proposed Class, or the third-party websites visited.

60. As a result of the Federal Wire Tap Act violations described herein, Plaintiff and the proposed Class have been damaged and are entitled to: (1) appropriate equitable and/or declaratory relief; (2) damages in an amount to be determined at trial (assessed as the greater of (a) the sum of actual damages suffered by Plaintiff and the proposed Class and any profits made by Defendants as a result of the violation, or (b) statutory damages of $100 per day per violation or $10,000, whichever is greater); and (3) reasonable attorneys' fees and costs.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's and the Class's favor and against Defendant as follows:

A. Certifying the Class and appointing Plaintiff as the Class representative;

B. Appointing Plaintiff's counsel as class counsel;

C. Declaring that Defendant's past conduct was unlawful, as alleged herein;

D. Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

E. Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F. Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G. Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

H. Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

I. Granting such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the Class, demands a trial by jury of any and all issues in this action so triable of right.

DATE: December 27, 2022

Respectfully submitted,

*/s/ Jonathan Jagher*
Jonathan M. Jagher
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
610.234.6486
jjagher@fklmlaw.com

Katrina Carroll
**LYNCH CARPENTER, LLP**
111 W. Washington St.

Suite 1240
Chicago IL 60602
312.750.1265
katrina@lcllp.com

Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878
gklinger@milberg.com